IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

DAVID P. NOAKES and )
CYNTHIA M. NOAKES, )
 )
    Plaintiffs, )
 )
 )
v. )    CIVIL ACTION NO. _____
 )
 )
MEGA LIFE AND HEALTH )
INSURANCE COMPANY, et al., )
 )
    Defendants. )
_____ )

## DECLARATION of PROFESSOR GEORGE L. PRIEST

I. Initial Statement of Qualifications

1.    I am more than twenty-one years of age. I reside in New Haven, Connecticut, and all statements made herein are based on my personal knowledge.

2.    I serve as a professor at Yale Law School, teaching courses in torts, civil procedure, insurance, insurance regulation, antitrust, products liability, and the economic analysis of law. I have served as a professor at Yale Law School since 1980. I hold a chair as the John M. Olin Professor of Law and Economics at Yale Law School.

3.    I received a Bachelor of Arts degree from Yale in 1969 and a law degree from the University of Chicago in 1973.

4.    Since 1980, I have served as a consultant to the Rand Corporation's Institute for Civil Justice in Santa Monica, California. With the support of the Rand Corporation, I organized and directed the first major empirical study of civil jury verdicts in the Chicago and San Francisco courts. See Peterson & Priest, The Civil Jury, Trends in Trials and Verdicts, Cook



County, Illinois, 1960-1979, Rand Corp., R-2881-ICJ (1982). The many important and influential studies of civil jury verdicts by Rand Corporation scholars over the past two decades all derive from this data source.

5.    Since 1982, I have served as the Director of the Program in Civil Liability at Yale Law School. The Program in Civil Liability is a research organization for Yale Law School faculty members, faculty members from other universities, Yale Law students, and other individuals interested in reform of the civil justice system in the United States. From time to time, the Program sponsors conferences and symposia on issues related to civil justice reform, including participants from the federal and state judiciary and federal and state legislatures. As examples, the Program in Civil Liability with support from the National Science Foundation, among others, sponsored the Symposium, Critical Issues in Tort Law Reform: A Search for Principles, published at 14 J. Legal Studies 459-818 (1985). The Program also sponsored the Symposia, Issues in Civil Procedure: Advancing the Dialogue, published at 69 Boston U. L. Rev. 467 (1989) and Modern Civil Procedure: Issues in Controversy, published at 54 Law and Contemp. Probs. 1 (1991).

6.    Much of my scholarly work has been directed toward analyzing both theoretically and empirically the relationship between cases settled before trial, cases tried to verdict, and verdicts subsequently appealed. In 1984, with the economist Benjamin Klein, I published an analytical model of the litigation/settlement process that, in the years since, has provided the basic analytical approach accepted by the academy for the evaluation of these relationships. Priest & Klein, The Selection of Disputes for Litigation, 13 J. Legal Studies 1 (1984).

7.    Based upon the model presented in that article, and upon subsequent extensions of the model, I have conducted many empirical studies of civil justice claims, trials, verdicts and appeals. These studies have been variously published in professional peer-reviewed journals both in the law and in the economics literature. See, e.g., Priest, Measuring Legal Change, 3 J. Law, Econ. & Org. 193 (1988); Priest, Private Litigants and the Court Congestion Problem, 69 Boston

U. L. Rev. 527 (1989); Priest, The Role of the Civil Jury in a System of Private Litigation, 1990 U. Chi. Leg. Forum 161 (1990).

8.    For many years, I have been interested in the role of both compensatory and punitive damages verdicts in our civil justice system.  I have conducted empirical studies of both the frequency and magnitude of compensatory and punitive damages verdicts.  I first published an empirical study of punitive damages verdicts using the Chicago court data described above in 1982.  Priest, Punitive Damages and Enterprise Liability, 56 So. Cal. L. Rev. 123 (1982).  I have conducted many empirical studies of both compensatory and punitive damages verdicts in the years since.  I have also written about the interaction of insurance and punitive damages.  Priest, Insurability and Punitive Damages, 40 Alabama Law Review 1009 (1989).

9.    In my study of insurance, I am acquainted with the range of modern insurance products, including the policy at issue in this litigation.  In addition, I have studied various problems related to the sale of these and similar insurance products.  I have testified several times as an economic expert in insurance regulatory hearings, including on the subject of insurance sales and claims practices.

10.    Over the course of my career, I have published articles in the following peer-reviewed economics journals:  Journal of Law & Economics, Journal of Legal Studies, Supreme Court Economic Review, Research in Law and Economics, Journal of Law, Economics & Organization, Journal of Economic Perspectives, Journal of Risk & Uncertainty, Geneva Papers on Risk and Insurance, the Italian journal Mercado, concorrenza, regale (Market, competition, regulation), and Journal of Reprints for Antitrust Law and Economics.

11.    I have served as a peer-review referee for the following economics journals:  American Economic Review, Economic Inquiry, Journal of Political Economy, Review of Economics and Statistics, Rand Journal of Economics, Journal of Law & Economics, Journal of Legal Studies, and Journal of Law, Economics & Organization.  I have also served as a peer-review referee for the National Science Foundation, Law and Social Science, Economics Division and for the journal Science.

12.    I have held appointments as a Visiting Professor in the Department of Economics, University of Miami and the Department of Economics, University of Toronto.

13.    I have testified many times before the United States Congress (both the Senate and the House of Representatives) and before many state legislatures on issues relating both to damages and to our civil justice system. I have been admitted as an economic expert or have presented economic testimony by deposition or expert report on remedial questions such as the quantum of damages in federal courts in the Northern, Middle, and Southern Districts of Alabama, Central and Northern Districts of California, District of Connecticut, Southern District of Florida, District of Maryland, District of Mississippi, District of Nevada, Northern District of Oklahoma, Eastern and Western Districts of Pennsylvania, Middle District of Tennessee, Eastern District of Texas, and the Court of Federal Claims; in state courts in the following states: Alabama (in Barbour, Bullock, Coffee, Greene, Hale, Houston, Jefferson, Lowndes, Mobile and Pike Counties), Alaska, Arizona, California, Connecticut, Florida, Iowa, Massachusetts, Minnesota, New Mexico, Tennessee, Texas, and West Virginia; and also in Ontario, Canada.

14.    A current curriculum vitae appears as Appendix I. A list of trial and deposition testimony within the past four years and my rate of compensation appear as Appendix II.

## II.    Question Presented and Conclusions

15.    I have been asked to express my opinion as to the amount in controversy in this action seeking compensatory and punitive damages for losses related to the alleged scheme of the Defendants to the detriment of the Plaintiffs. Testimony that I presented with respect to the amount in controversy in litigation against insurance companies has been discussed in the federal reports in cases seeking removal to both the Southern and Northern Districts of Alabama. See, Jackson v. American Bankers Ins. Co. of Florida et al., 976 F.Supp. 1450, 1452-53 (S.D. Ala. 1997); Davis v. Franklin Life Ins. Co., 71 F.Supp. 2d 1197, 1199 (N.D. Ala. 1999).

16.    The Plaintiffs' Complaint in this action alleges ten counts of wrongdoing by the Defendants with respect to the sale, provision and administration of group life insurance. The

Plaintiffs allege that the Defendants' "scheme" or "Marketing Scam" allowed the Defendants to reap "windfall profits". Complaint at ¶ 13, p. 7. The scheme involved "the illegal concealment and non-disclosure by the Defendants of incestuous relationships among the corporate Defendants", including "the establishment and administration of illusory or 'dry' 'trusts' and violation of trust duties to the Plaintiffs", Complaint at ¶ 13; actions that "were part of a calculated and conscious 'death spiral' scheme", Complaint at ¶ 37. The Plaintiffs allege that "[t]he 'death spiral' sales method employed by Defendants caused insureds with health problems to become isolated and eventually eliminated from the Defendants' book of business." Complaint at ¶ 39. The Plaintiffs also claim that the "Defendants willfully, wantonly, intentionally, recklessly, [and] maliciously . . . misrepresented the material facts . . . to Plaintiffs." Complaint at ¶ 77. According to the Complaint, on account of these wrongs, the Plaintiffs claim to be seeking compensatory damages and punitive damages including damages for "severe mental and emotional distress." Complaint at ¶¶ 99, 105.

17. The amount in controversy in any given litigation is different from the settlement value of a case or the expected value of a legal claim. To determine what is "in controversy" in any case requires a review of the entire continuum of possible trial outcomes. The single "amount in controversy" in the case--again, different from the settlement value of the case-- represents the furthest point on that continuum: the award that a jury might render if it accepts each of the allegations of the plaintiff and rejects each of the allegations and defenses of the defendant. Thus, for the purpose of the evaluation of the amount in controversy here, it is necessary to presume that the Plaintiffs will successfully prove to the jury that the Defendants' scheme was conducted "willfully, wantonly, intentionally, recklessly [and] maliciously", Complaint at ¶ 77; was devised to "reap windfall profits" and "ill-gotten gains", generating "millions of dollars of profits". Complaint at ¶¶ 13, 30. Correspondingly, it is also necessary to presume that the jury will reject all defenses the Defendants may offer. Finally, it is also necessary for this analysis to presume that the Plaintiffs will be able to prove that they suffered the full range of losses that might be suffered by victims of willful and intentional

misrepresentations, including 1) damages based upon the Defendants "charging premiums substantially in excess of what the premiums would have been if they had been fairly calculated", Complaint at ¶ 61; damages based upon the Defendants' "refus[al] to pay Plaintiffs the full amount owed under the health coverage", Complaint at ¶ 94; as well as damages for the "severe mental and emotional distress" that the Plaintiffs suffered.  Complaint at ¶¶ 99, 105.

18.    In my research and study of damages verdicts, I have reviewed trial court verdicts in many jurisdictions as well as state appellate and Supreme Court opinions evaluating the appropriateness of individual damages verdicts.  It is well-known and my research confirms that, in suits against insurance companies claiming misrepresentation and fraud, the punitive damages verdict often exceeds the compensatory damages verdict by some multiple.  The amount in controversy in an action, of course, must include both the compensatory and punitive damages elements of the verdict that might be rendered by a jury after trial.

A.  Compensatory Damages

19.    The compensatory damages measure in this case will equal the sum of the economic losses suffered by the Plaintiffs along with damages for mental and emotional distress that might accompany the Plaintiffs' proof of fraud and bad faith.

20.    Although no two cases are exactly alike, it is instructive in evaluating the compensatory damages amount in controversy to compare this litigation to the compensatory damages verdict rendered in a similar case in Alabama, Life Insurance Company of Georgia v. Daisey Johnson, 701 So.2d 685 (Ala. 1997), a case that similarly involved claims of fraud and bad faith against an out-of-state insurer, a verdict subsequently affirmed by the Alabama Supreme Court.  In the Daisey Johnson case, a jury found that an insurer had fraudulently sold Ms. Johnson an insurance policy leading her to pay premiums for insurance benefits that she would never recover.  In addition to a substantial punitive damages verdict (which I ignore for purposes of analysis in this section), the jury awarded Ms. Johnson a compensatory damages verdict of $250,000.

21.    The Alabama Supreme Court affirmed the compensatory damages verdict of $250,000 in favor of Ms. Johnson, emphasizing that Ms. Johnson had paid unnecessary premiums over a three-year period.

22.    In the <u>Daisey Johnson</u> case, Ms. Johnson proved that she had been defrauded in the amount of $3,000 to $4,000, though she had not been denied insurance benefits. As in this case, Ms. Johnson showed that the Defendant took advantage of "vastly superior knowledge and expertise". Noakes Complaint at ¶ 35. In contrast, however, the <u>Daisey Johnson</u> case did not involve the denial of insurance benefits. Here, the Plaintiffs claim that they "made significant claims on the coverage in 2003 and 2004. As a result, the premiums increased. Most of the claims submitted for payment were inexplicably denied." Complaint at ¶ 46. In this case, the denial of benefits along with overcharges is likely to generate both greater economic losses and greater mental anguish and emotional distress than resulted from the overcharges only in the <u>Daisey Johnson</u> case. As a consequence, it is entirely reasonable to conclude that the compensatory damages in controversy in this litigation exceeds the $250,000 in compensatory damages recovered by Ms. Johnson.

## B.  <u>Punitive Damages</u>

23.    As indicated above, my research and study of punitive damages verdicts shows that the punitive damages award in a case may often be many multiples of a compensatory award.

24.    In my research and study of damages verdicts in the State of Alabama, I have reviewed Alabama Supreme Court decisions over the period 1989 through December 31, 2004. From among these verdicts, I have specifically examined suits against insurance companies and suits against out-of-state insurance companies--such as the The MEGA Life and Health Insurance Company, here.

25.    My research of Alabama verdicts over these years demonstrates that over the period, 1989 through 1996, the average punitive damages verdict affirmed against an out-of-state insurance company by the Alabama Supreme Court was $1,785,070. (This number is corrected

for verdicts affirmed by the Alabama Supreme Court prior to the U.S. Supreme Court's decision in BMW of North America, Inc. v. Gore, 116 S.Ct. 1589 (1996) but subjected to later review subsequent to that decision.)

26.    As all are aware, the Supreme Court of Alabama has adopted a somewhat stricter standard for the evaluation of punitive damages verdicts following the BMW v. Gore decision, supra. In decisions since 1996 (including its re-review of verdicts awarded at earlier points), the Alabama Supreme Court has again had the opportunity to review punitive damages verdicts in actions against out-of-state insurance companies. Following BMW v. Gore through December 31, 2000, the average punitive damages verdict affirmed against an out-of-state insurance company by the Alabama Supreme Court equaled $874,667.

27.    Substantial punitive damages verdicts against out-of-state insurance companies have continued to be affirmed by the Alabama Supreme Court in more recent periods. Over the period January 1, 2001 through December 31, 2004, the average punitive damages verdict affirmed by the Alabama Supreme Court against an out-of-state insurer equaled $252,500.

28.    Finally, although substantially lower than the verdicts affirmed in the period 1989-96, the Alabama Supreme Court has affirmed large punitive damages verdicts generally in recent years. Against all defendants, the average punitive damages verdict affirmed by the Alabama Supreme Court in the year 2000 equaled $244,188; in 2001 equaled $297,727; in 2002 equaled $425,000; in 2003 equaled $339,119; and in 2004 equaled $2,335,793. For the five-year period, January 1, 2000 through December 31, 2004, the average punitive damages verdict affirmed by the Alabama Supreme Court equaled $490,874.

29.    The United States Supreme Court has again recently reviewed Constitutional standards for the award of punitive damages. State Farm Mut. Auto Ins. Co. v. Campbell, 123 S.Ct. 1513 (2003). The United States Supreme Court has indicated Constitutional problems when punitive damages awards exceed "a single-digit ratio" (i.e., nine to one), 123 S.Ct. at 1524. But this means that if the Plaintiffs in this case were to receive a compensatory award of only $7,501, a punitive damages award nine times that amount would result in an aggregate award greater than

8

$75,000.[1] If the punitive damages multiplier were three-to-one—a multiplier often affirmed by the Alabama Supreme Court—a compensatory award equal to only $18,751 would generate an aggregate award greater than $75,000.[2] If the punitive damages multiplier were even lower: 2.5—again, a figure often invoked by the Alabama Supreme Court—a compensatory award equal to $21,428.58 would generate an aggregate award just greater than $75,000.[3]

### III.  General Conclusion

30.    Based upon my research and study of damages verdicts awarded in Alabama and affirmed by the Alabama Supreme Court involving allegations such as those of the Plaintiffs on the part of an out-of-state insurance company like the Defendant MEGA, it is my opinion that the amount in controversy in this action involving punitive damages alone exceeds $75,000 for each of the Plaintiffs in this action. The full amount in controversy, including both compensatory and punitive damages, exceeds $75,000 for each Plaintiff a fortiori.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and understanding.

Executed on this 6th day of May, 2005.

George L. Priest

---

[1] Nine times $7,501 equals $67,509.  Their sum equals $75,010.

[2] Three times $18,751 equals $56,253.  Their sum equals $75,004.

[3] 2.5 times $21,428.58 equals $53,571.45.  Their sum equals $75,000.03.

**APPENDIX I**

Resume

March 2005

George L. Priest

Yale Law School
P.O. Box 208215
New Haven, Connecticut 06520-8215
Telephone: (203) 432-1632
Fax: (203) 432-7225
e-mail: george.priest@yale.edu

Home Office
350 Livingston Street
New Haven, Connecticut 06511
Telephone: (203) 562-8467
Fax: (203) 562-7692

Personal:

Age: 57
Birth: November 24, 1947
Married, four children

Employment:

John M. Olin Professor of Law and Economics, Yale Law School, since 1986. Professor of Law, Yale University, since 1981. Director, Program in Civil Liability, Yale Law School, since 1982. Director, John M. Olin Center for Studies in Law, Economics and Public Policy, Yale Law School, 1983-1988; Co-Director, since 1988.

Visiting Professor, Yale University, 1980-81. Professor of Law, University of California, Los Angeles, 1980-81; Visiting Professor, 1979-80. Professor of Law, State University of New York, Buffalo, 1979-80; Associate Professor, 1977-79. Lecturer and Fellow in Law and Economics, University of Chicago Law School, 1975-77. Associate Professor of Law, University of Puget Sound, Tacoma, Washington, 1975-1977 (on leave); Assistant Professor, 1973-75.

Education:

B.A., Yale University (1969); J.D., University of Chicago (1973).

Bibliography:

A. Published and Committed Articles

1.    Law and Economic Distress: Sangamon County, Illinois 1837-1844, 2 J. Legal Studies 469 (1973). Reprinted in Essays in Nineteenth-Century American Legal History (W. Holt, ed., 1976).

2.    The History of the Postal Monopoly in the United States, 18 J. Law & Econ. 33 (1975).

3.    The Common Law Process and the Selection of Efficient Rules, 6 J. Legal Studies 65 (1977).

1

4.   Cartels and Patent License Arrangements, 20 J. Law & Econ. 309 (1977).  Reprinted in 8 J. Rep. for Antitrust Law & Econ. 357 (1979).

5.   Breach and Remedy for the Tender of Nonconforming Goods under the Uniform Commercial Code:  An Economic Approach, 91 Harv. L. Rev. 960 (1978).  Excerpts reprinted in Economic Readings in Contract Law (Posner & Kronman eds., 1978).

6.   Selective Characteristics of Litigation, 9 J. Legal Studies 399 (1980).

7.   The Structure and Administration of the Magnuson-Moss Warranty Act, in Economic Regulation and Consumer Welfare:  The Federal Trade Commission in the 1970's (Clarkson and Muris eds., Cambridge U. Press, 1981).

8.   The New Scientism in Legal Scholarship:  A Comment on Clark and Posner, in Symposium: "Legal Scholarship:  Its Nature and Purposes," 90 Yale L.J. 1284 (1981).

9.   A Theory of the Consumer Product Warranty, 90 Yale L.J. 1297 (1981). Awarded the 1981-82 Prize for Distinguished Scholarship in Law and Economics (University of Miami).  Excerpted and reprinted variously.

10.  Punitive Damages and Enterprise Liability, 56 So. Cal. L. Rev. 123 (1982).

11.  The Civil Jury:  Trends in Trials and Verdicts, Cook County, Illinois, 1960-1979 (with Mark Peterson) (Rand Corp., R-2881-ICJ, 1982).  Reprinted 32 Fed. Ins. Counsel Q. 361 (1982).

12.  Will Uniform Legislation Increase or Decrease the Rate of Injuries from Product Defects?, in Product Liability and Tort Law Reform at 7 (Theberge ed., 1982).

13.  Regulating the Content and Volume of Litigation:  An Economic Analysis, 1 Sup. Ct. Econ. Rev. 163 (1982).  Reprinted as Rand Corp., R-3084-ICJ (1983).

14.  The Best Evidence of the Effect of Products Liability Law on the Accident Rate, 91 Yale L.J. 1386 (1982).

15.  Social Science Theory and Legal Education:  The Law School as University, 33 J. Leg. Ed. 437 (1983).

16.  The Selection of Disputes for Litigation (with Benjamin Klein), 13 J. Legal Studies 1 (1984). Reprinted as Rand Corp., R-3084-ICJ (1984).

17.  Law and Economics and Law Reform:  A Comment on Barth's Cancer Compensation Proposal, 13 J. Legal Studies 587 (1984).

18.  Gossiping about Ideas, 93 Yale L.J. 1625 (1984).

19.  The Economics of Cost and Fee Rules:  A Primer, In Health-Related Claims:  Can the Tort and Compensation Systems Cope? at 189 (1984).

20.  Reexamining the Selection Hypothesis, 14 J. Legal Studies 215 (1985).

21.    Commentary on the Dodd and Gorton Amendments to S-100 (The Kasten Bill) (with Guido Calabresi), Working Paper #34, Program in Civil Liability, Yale Law School, June 1985.

22.    What Economists Can Tell Lawyers about Intellectual Property,  8 <u>Research in Law & Econ</u>. 19 (1986).

23.    Introduction, "Critical Issues in Tort Law Reform:  A Search for Principles" (with Richard A. Epstein), 14 <u>J. Legal Studies</u> 459 (1985).

24.    The Invention of Enterprise Liability:  A Critical History of the Intellectual Foundations of Modern Tort Law, 14 <u>J. Legal Studies</u> 461 (1985).  Excerpted and reprinted variously.

25.    Legal and Scientific Concepts of Causation, in <u>Causation and Financial Compensation</u> at 475 (Burger, ed. 1986).

26.    The Personality Theory of Agency Regulation, 3 <u>Yale J. Regulation</u> 391 (1986).

27.    My Greatest Benefactions, 9 <u>U. Puget Sound L. Rev.</u> 457 (1986).

28.    Compensation Systems and Tort Law:  A Preliminary Comparative Approach in <u>Risk, Compensation, and Liability:  The Policy Choices</u> at 161 (C.E.D., 1986).

29.    The Current Insurance Crisis and Modern Tort Law, 96 <u>Yale L.J.</u> 1521 (1987).  Excerpted and reprinted variously.

30.    Puzzles of the Tort Crisis, 48 <u>Ohio L. Rev.</u> 497 (1987).

31.    Modern Tort Law and Its Reform, 22 <u>Valparaiso L. Rev.</u> 1 (1987).

32.    The Liability Crisis:  A Diagnosis, Fall 1987 <u>Yale Law Report</u> 2.

33.    The Disappearance of the Consumer From Modern Products Liability Law, in <u>The Frontier of Research in the Consumer Interest</u> at 771 (Maynes ed., 1988).

34.    Measuring Legal Change, 3 <u>J. Law, Econ. & Org.</u> 193 (1988).

35.    The Aims of Privatization, 6 <u>Yale Law & Policy Rev.</u> 1 (1988).

36.    Satisfying the Multiple Goals of Tort Law, 22 <u>Valparaiso L. Rev.</u> 643 (1988).

37.    Products Liability Law and the Accident Rate, in <u>Liability: Perspectives and Policy</u> at 184 (Litan & Winston eds., Brookings Inst. 1988).

38.    Compensation for Personal Injury in the United States, in <u>Compensation for Personal Injury in Sweden and other Countries</u> at 127 (J. Hellner ed., 1988).

39.    Understanding the Liability Crisis, in <u>New Directions in Liability Law</u> (Proceedings of the Academy of Political Science) at 196 (W. Olson ed., 1988).

3

40. Statement Dissenting and Concurring, American Bar Association, <u>Report of the Commission to Improve the Liability Insurance System</u> at F-1 (1989).

41. The Antitrust Suits and the Public Understanding of Insurance, 63 <u>Tulane L. Rev.</u> 999 (1989). Reprinted variously.

42. Strict Products Liability: The Original Intent, 10 <u>Cardozo L. Rev.</u> 2301 (1989). Reprinted variously.

43. La Controrivoluzione nel Diritto della Responsibilita' da Prodotti negli Stati Uniti d'America (The Counter-Revolution in Products Liability in the United States), 119 <u>Il Foro Italiano</u> 1 (N.4, March 1989).

44. Introduction, "Issues in Civil Procedure: Advancing the Dialogue" (with Judyth W. Pendell), 69 <u>Boston U.L. Rev.</u> 467 (1989).

45. Private Litigants and the Court Congestion Problem, 69 <u>Boston U. L. Rev.</u> 527 (1989).

46. Insurability and Punitive Damages, 40 <u>Alabama L. Rev.</u> 1009 (1989). Excerpted and reprinted variously.

47. The Modern Irony of Civil Law: A Memoir of Strict Products Liability in the United States, 9 <u>Tel-Aviv U. Studies in Law</u> 93 (1989).

48. The Increasing Division Between Legal Practice and Legal Education, 37 <u>Buff. L. Rev.</u> 681 (1989).

49. Crisis Comes to the Insurers: The Modern Misunderstanding of Insurance Policy, 3 <u>Insurance Law Anthology</u> 13 (1989).

50. The Continuing Crisis in Liability, 1 <u>Prod. Liability L. J.</u> 243 (1989).

51. The Deep Justification for Tort Reform, in <u>Product Liability Reform: Debating the Issues</u> at 7 (Chilton ed., Cen. Study Amer. Bus., No. 98, Washington Univ., St. Louis 1990).

52. The New Legal Structure of Risk Control, 119 <u>Daedalus</u> 207 (1990). Reprinted in <u>Risk</u> at 207 (Burger ed., 1993); forthcoming in <u>The International Library of Essays in Law and Society</u> (Sarat, ed., 2006).

53. L'Assicurazione Obbligatoria per la Circolazione degli Autoveicoli negli Stati Uniti (The Compulsory Automobile Insurance Problem in the United States), 1 <u>Quadrimestre rivista di diritto privato</u> 32 (1990).

54. The Role of the Civil Jury in a System of Private Litigation, 1990 <u>U. Chi. Leg. Forum</u> 161 (1990).

55.   Riding the Tide toward Modern Tort Law:  William Prosser's "The Assault upon the Citadel (Strict Liability to the Consumer)", 100 <u>Yale L.J.</u> 1470 (1991).

56.   Law and Economics after Europe's Revolution, in <u>Economic Analysis of Law:  A Collection of Applications</u> (Weigel, ed., 1991).

57.   The Modern Expansion of Tort Liability:  Its Sources, Its Effects, and Its Reform, 5 <u>J. Econ. Perspectives</u> 31 (1991).

58.   Foreword, "Modern Civil Procedure:  Issues in Controversy" (with Judyth W. Pendell), 54 <u>Law and Contemp. Probs.</u> 1 (1991).

59.   Can Absolute Manufacturer Liability be Defended?, 9 <u>Yale J. on Reg.</u> 237 (1992).

60.   The Inevitability of Tort Reform, 26 <u>Valparaiso L. Rev.</u> 701 (1992).

61.   The Triumphs or Failings of Modern Legal Scholarship and the Conditions of its Production, 63 <u>Colorado L. Rev.</u> 725 (1992).

62.   Justifying the Civil Jury, in <u>Verdict:  Assessing the Civil Jury System</u> at 103 (Litan ed., Brookings Institution 1993).

63.   The Origins of Utility Regulation and the "Theories of Regulation" Debate, 36 <u>J. Law & Econ.</u> 289 (1993).  Reprinted in <u>Transaction Cost Economics</u> (Williamson and Masten eds., 1994).

64.   The Growth of Interdisciplinary Research and the Industrial Structure of the Production of Legal Ideas:  A Reply to Judge Edwards, 91 <u>Mich. L. Rev.</u> 1929 (1993).

65.   Lawyers, Liability, and Law Reform:  Effects on American Economic Growth and Trade Competitiveness, 71 <u>Denver U.L. Rev.</u> 115 (1993).

66.   Economic Problems of Accidents and Compensation, 15 <u>U. Hawaii L. Rev.</u> 544 (1993).

67.   The Ambiguous Moral Foundations of the Underground Economy, 103 <u>Yale L.J.</u> 2259 (1994).

68.   Socialism, Eastern Europe, and the Question of the Postal Monopoly in <u>Governing the Postal Service</u> at 54 (American Enterprise Institute, Sidak ed., 1994).

69.   Contracts Then and Now:  An Appreciation of Friedrich Kessler, 104 <u>Yale L.J.</u> 2145 (1995).

70.   Channeling Civil Litigation:  A Comment on Civil Justice Reform in Ontario, in <u>Prospects for Civil Justice</u> at 237, Ontario Law Reform Commission, (1995).

71.   The Government, the Market, and the Problem of Catastrophic Loss, 12 <u>J. Risk & Uncertainty</u> 219 (1996).  Reprinted as Les Risques, "Catastrophe":  Intervention Publique ou Marchés Concurrentiels?, 34 <u>Risques</u> 69 (Avril-Juin 1998).

72.   Punitive Damages Reform:  The Case of Alabama, 56 <u>La. L. Rev.</u> 825 (1996).

73.  Procedural versus Substantive Controls of Mass Tort Class Actions, 26 J. Legal Studies 521 (1997).

74.  Can Privatization Bring Economic Growth to Africa?, in Gerald Bisong Tanyi, Designing Privatization Strategies in Africa:  Law, Economics, Practice at ix (1997).

75.  The American Legal System and the Insurability of Environmental Damage and Catastrophic Loss, 83 Geneva Papers on Risk and Insurance 190 (1997).

76.  Antitrust Enforcement in the Information Age, 4 Texas Rev. L. & Pol. 141 (1999).

77.  Henry Manne and the Market Measure of Intellectual Influence, 50 Case Western Reserve L. Rev. 325 (1999).

78.  The Simple Economics of Civil Procedure, 9 Kansas J. of Law & Pub. Pol. 389 (2000).

79.  Economics of Civil Justice Reform Proposals, 9 Kansas J. of Law & Pub. Pol. 401 (2000).

80.  Controversies Surrounding Class Actions, 9 Kansas J. of Law & Pub. Pol. 481 (2000).

81.  Pobreza, inequidad y crecimiento económico.  Principios básicos (Poverty, Inequality, and Economic Growth:  Simple Principles), SELA 1999 Revista Jurídica de la Universidad de Palermo 157 (2000).

82.  The Culture of Modern Tort Law, 34 Valparaiso L. Rev. 573 (2000).

83.  Reflexiones Respecto de la Contratación Masiva, in Por Qué Hay Que Cambiar el Código Civil? at p. 155 (Fernando Cantuarias Salaverry, ed. 2001).

84.  A Careful Look at the Drama of *Bush v. Gore*, Summer 2001 Yale Law Report 40.

85.  International Control of Environmental Harm through Regulation and Law, Forward to Lucas Bergkamp, Liability and Environment at xvii (2001).

86.  The Constitutionality of State Tort Reform Legislation and *Lochner*, 31 Seton Hall L. Rev. 683 (2001).

87.  Reanalyzing Bush v. Gore:  Democratic Accountability and Judicial Overreaching, 72 U. Colo. L. Rev. 953 (2001).

88.  Derechos economicos, derechos personales y otras restricciones sobre los resultados de las mayorias, (Economic Rights, Personal Rights, and Other Constraints on Majoritarian Outcomes), Los derechos fundamentales, SELA 2001 at 19.

89.  U.S. v. Microsoft:  A Legal and Economic Analysis of the Settlement, Washington Legal Foundation, Contemporary Legal Notes, Number 41, March, 2002.

90.   The [Punitive Damages] Problem and Efforts to Understand it, in Sunstein, et al., Punitive Damages:  How Juries Decide at 1 (2002).

91.   L'antitrust negli Stati Uniti e in Europa.  Analisi e psicoanalisi di una divergenza (The Prospects of Convergence of U.S. and European Commission Competition Policies), 4 mercato concorrenza regole 151 (April 2002).

92.   Government Insurance versus Market Insurance, 28 Geneva Papers on Risk and Insurance 71 (2003).

93.   Small Business, Economic Growth, and the Huffman Conjecture, 7 J. of Small and Emerging Business Law 1 (2003).

94.   Flawed Efforts to Apply Modern Antitrust Law to Network Industries, High-Stakes Antitrust at 117 (AEI/Brookings Institute Press, 2003).

95.   The Cumulative Sources of the Asbestos Litigation Phenomenon, 31 Pepperdine L. Rev. 261 (2004).

96.   The Problematic Structure of the September 11th Victim Compensation Fund, 53 DePaul L. Rev. 527 (2004).

97.   Beyond Brown:  Opportunity versus Equality as an Empowerment Norm:  An Essay for Owen Fiss, 58 U. Miami L. Rev. 347 (2004).

98.   Law and Economics, forthcoming in American Conservatism:  An Encyclopedia ___ (2004).

99.   What We Know and What We Don't Know about Modern Class Actions, Manhattan Inst., Civil Justice Rep. (2005).

100.  The Rise of Law and Economics:   A History of the Early Years in Law and Economics: Essays from the Founding Fathers (Rowley & Parisi, eds.) (forthcoming 2005); reprinted as El surgimiento del análisis económico del derecho:  una memoria de los primeros años, 2 Revista de Economía y Derecho 51 (Autumn 2004).

101.  Reexamining the Market for Judicial Clerks and other Assortative Matching Markets, 22 Yale J. Reg. 123 (2005).

102.  The Illusive Attraction of No Fault, forthcoming ___ Clev. St. L. Rev. ___


B.    Current Drafts in Circulation

103.  Internalizing Costs (mimeo 1984, 1987, 1989, 1990).

104.  The Current Crisis in Compensation Systems for Traffic Accidents in the United States (mimeo 1990).

105.    Justifying Tort Reform in our Confused System of Accident Law (mimeo 1991).

106.    The Government versus the Market in Protecting against Economic Misfortune (July 1998).

C. Legislative, Executive and Regulatory Testimony (* indicates written report also submitted).

107.*   Modernizing the Regulation of Product Warranties, Federal Trade Commission, 1985.

108.*   "Products Liability Reform and the Dodd and Gorton Amendments to S.100", United States Senate Committee on Commerce, Science and Transportation, June 25, 1985.

109.*   "A Legal Analysis of the Jurisdiction and Choice of Law Provisions of the Gorton Amendment No. 1951 to S.1999" (with Professor Perry Dane), United States Senate Committee on Commerce, Science and Transportation, June 13, 1986.

110.    "Tort Reform and Insurance Regulation", Select Committee on Insurance, California Legislature, October 20, 1986.

111.    "A Legal Analysis of S.2805, An Act Concerning Product Liability and Punitive Damages", Committee on the Judiciary, New Jersey Senate, February 9, 1987.

112.*   "Joint and Several Liability:  The Issues and Remaining Questions", Ontario Law Reform Commission, March 23, 1987.

113.    "Products Liability Reform and the Insurance Crisis", Committee on the Judiciary, Louisiana Senate, June 9, 1987.

114.*   "An Analytical Critique of the United States' No-Fault Automobile Experience", Inquiry into Motor Vehicle Accident Compensation in Ontario (Osborne Inquiry), June 30, 1987.

115.*   "Hearings on the Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States", Committee on the Judiciary, United States Senate, 100th Congress, 1st Session 2439-2444 (1987).

116.*   "The Liability Crisis, the Antitrust Suits and the McCarran-Ferguson Act", Subcommittee on Antitrust, Monopolies and Business Rights, Committee on the Judiciary, United States Senate, June 14, 1988.

117.*   "Allowing Drivers a Choice between No-Fault and Fault-Based Auto Insurance: An Analytical Critique", Ontario Automobile Insurance Board, May 24, 1989.

118.    "Alternative Compensation Systems and the Problems of Modern Tort Law", Minnesota Injury Compensation Study Commission, June 21, 1989.

8

119.*  "The Costs of Regulation Given the Role of the Insurance Industry in Modern Society", Consolidated Hearings before the Insurance Commissioner of the State of California, January 9, 1990.

120.*  "The Successes and Failures of Threshold No-Fault Systems in the United States", Standing Committee on General Government, Parliament of Ontario, January 17, 1990.

121.*  "The Effects of Proposition 103 on Consumers and on Competition in Property/Casualty Insurance", Comment on Proposed Regulations, Department of Insurance, State of California, April 8, 1991.

122.*  "Confiscatory Regulation and the Effects of Proposition 103's Rollback Orders on Consumers and on Competition in Property/Casualty Insurance", Department of Insurance, State of California, November 21, 1991.

123.*  "Internalizing the Costs of Nuclear Power", Ontario Court (General Division), April 23, 1993.

124.  Economic Function of Life Insurance Agency Commissions and the Effects on Consumers of Mandatory Rebates," Department of Insurance, State of California, October 18, 1993.

125.*  "How to Privatize Intelsat".

126.*  McCarran-Ferguson Reform, State Regulation and the Consumer Interest, National Conference of Insurance Legislators, New York, November 12, 1994.

127.*  "Statement Concerning H.R. 10", Common Sense Legal Reforms Act of 1995, Committee on the Judiciary, 104th Congress, February 13, 1995.

128.*  "Statement Concerning Punitive Damages Tort Reform," Committee on the Judiciary, United States Senate, April 4, 1995; and "Response to Statement of [Clinton] Administration Policy of April 25, 1995," May 2, 1995.

129.  "Punitive Damages Reform in Historical Perspective," Hearing on S.1554, "Fairness in Punitive Damages Awards Act," Committee on the Judiciary, United States Senate, July 29, 1998; and Response to Senator Orrin G. Hatch, Chairman, United States Senate Committee on the Judiciary Re: S.1554, "Fairness in Punitive Damages Award Act," September 3, 1998.

130.  "The Antitrust Implications of the Cable Bills," New Jersey State Assembly, February 3, 2003; New Jersey State Senate, March 10, 2003.

131.  Securing Our Economic Future: The White House Conference on the Economy, The High Costs of Lawsuit Abuse, December 15, 2004

D. Journalism

132.  "The Benefits of Tort Reform--Sense & Nonsense", Wall Street Journal, February 11, 1987 at 26.

133.  "USA, Cartelli in Rimonta" in Dossier Antitrust at 23, Il Sole 24 Ore, 29 January 1988, Roma, Italia.

134.  Commentary, "The (Pop-Gun) War Against the Insurers", Hartford Courant, June 26, 1988 at C1.

135.  "Tort Law, Insurance, and the Insurance Crisis", in Tort Law and the Insurance Crisis, The World & I at 522 (Criner ed., February, 1989).

136.  "How to Control Liability Costs", Fortune, April 24, 1989 at 323.

137.  "The Antitrust Suit Counteroffensive to Tort Reform", Legal Backgrounder, Washington Legal Foundation, May 12, 1989.

138.  "Negli States la Privatizzazione si Chiama Deregulation", L' Opinione, 21 March 1989 at 57, Roma, Italia.

139.  "Will Argentina Simply Replace One Monopoly With Another?", Wall Street Journal, September 22, 1989 at A13.

140.  "What Bork and Sarokin Have in Common", (letter) Wall Street Journal, August 22, 1994 at A15.

141.  "The Punitive Damages Problem in Alabama", Birmingham News, December 29, 1996 at 1C.

142.  "The Supreme Court Passes the Buck on Asbestos", Wall Street Journal, July 2, 1997 at A15.

143.  "True Conservatism and Satellite Competition", Space News, May 11, 1998 at 21; reprinted Congressional Record, May 20, 1998 at E908.

144.  "The Stakes in the Case against Microsoft", Wall Street Journal, May 19, 1998 at A22; "The Dangers of Attack on Microsoft" (response to Robert H. Bork), Wall Street Journal, June 8, 1998 at A23.

145.  "The Conservative Delusion over Auto Choice", Wall Street Journal, July 21, 1998 at A14. Reprinted in "On the Issues," American Enterprise Institute, August, 1998; Louisiana Advocates at 4 (September, 1998).

146.  "Why Clinton Lied", Wall Street Journal, September 23, 1998 at A22.

147.  "Trial by State," review of Richard A. Posner, An Affair of State in The Wall Street Journal, September 14, 1999 at A20.

148.  "Judge Jackson's Case against Microsoft," Wall Street Journal, November 8, 1999 at A50.

149.  Dialogue with Jonathan Zittrain: "The False Epic of the Microsoft Decision," November 24, 1999; "Judge Jackson's Case More Carefully Considered," November 30, 1999; "General Rules, the Remedy in Microsoft, and the Role of Judge Posner," December 1, 1999, Slate Magazine, www.slate.com/dialogues.

150.  "Don't Count on a Breakup," Wall Street Journal, April 26, 2000 at A26; reprinted in the Toronto Financial Post, April 28, 2000 at C19.

151.  "On Character Assassination," Yale Docket, May 2000 at p. 3.

152.  "Some Kind of Remedy," The New York Times, June 9, 2000 at A31.

153.  "Letter to Larry," The Industry Standard, July 3, 2000 at 122.

154.  "Community Impact Evaluation Needed," The Denver Post, August 12, 2000 at 7B.

155.  "It's Not Just Alabama," Reader's Digest, October 2000 at 156.

156.  "The Deeper Scandal of the Clinton Pardons," (with Minor Myers III), The Christian Science Monitor, February 26, 2001 at 9.

157.  "A Ruling for 'Predators'–and Consumers," The Wall Street Journal, May 3, 2001 at A18.

158.  "The GE/Honeywell Precedent," (with Franco Romani), The Wall Street Journal, June 20, 2001 at A18.

159.  "Justice Bows to Reason," The Wall Street Journal, September 7, 2001 at A14.

160.  "Microsoft Wins . . . Sort Of," The Wall Street Journal, November 2, 2001 at A14.\

161.  "Microsoft and the Courts," (response to Larry Lessig) The New York Times, November 16, 2001 at A24.

162.  "The End of the Microsoft Case," The Wall Street Journal, November 4, 2002 at A14; reprinted in the National Post, November 5, 2002 at FP15.

163.  "Class Warfare," The Wall Street Journal, May 5, 2003 at A14; reprinted in the National Post, May 6, 2003 at FP15.

164.  "An Expensive Game to Play," April 12, 2004, Tech Central Station, www.techcentralstation.com/041204E.html

165.  "Supreme Wisdom," The Wall Street Journal, June 18, 2004 at A10.

166.  "Tackling Tort Reform," February 11, 2005, National Review Online, http://www.nationalreview.com/comment/priest200502111122.asp

Distinguished Lectureships:

Olin Distinguished Lecture Series, University of California at Los Angeles School of Business (Inaugural Lecture, 1985).

Monsanto Lecture in Tort Law and Jurisprudence, Valparaiso Law School (Inaugural Lecture, 1987).

Distinguished Visiting Professor in Legal Theory, University of Toronto Faculty of Law and Department of Economics, Michelmas Term, 1988.

Martin P. Miller Centennial Lecture, University of Denver College of Law, 1992.

Fifty-Sixth Cleveland-Marshall Fund Lecture, Cleveland-Marshall College of Law, 1993.
Twenty-Sixth Geneva Lecture on Insurance, Geneva Association, 2002.

Twentieth Higgins Distinguished Visiting Professor, Lewis & Clark Law School, 2003.

Distinguished Economist Lecture, Bureau of Competition, Federal Trade Commission, 2004.


Other Awards:

Templeton Honor Rolls for Education in a Free Society, 1997.

Profesor Honorario, Universidad Peruana de Ciencias Aplicadas, Lima, Peru, 2003.


Teaching:

Recent courses:  Antitrust; Advanced Antitrust: Network Industries; Civil Procedure; Insurance and Public Policy; Insurance Regulation; Regulated Industries; Constitutional Law; Federalism; Capitalism; Campaign Finance Regulation; Products Liability; Advanced Antitrust; Torts; Democracy or Capitalism? (seminar).

Other offerings:  Contracts; Commercial Law; Price Theory; Remedies; Criminal Case Settlement (seminar); Theories of the Common Law (seminar).


Journal Referee:

American Economic Review; Economic Inquiry; Journal of Health Politics, Policy and Law; Journal of Japanese Studies; Journal of Law & Economics; Journal of Law, Economics & Organization; Journal of Legal Studies; Law and Policy; Journal of Political Economy; Rand Journal of Economics; National Science Foundation (Law and Social Sciences) (Economics); Review of Economics and Statistics; Science.

Consultantships:

Institute for Civil Justice, The Rand Corporation, since 1980;

Federal Trade Commission, 1984-85; 2001-03.


Other Professional Service:

President's (U.S.) Commission on Privatization, 1987-88.

American Bar Association, President's Commission to Improve the Liability Insurance System, 1987-89.

Special Master, McLendon v. The Continental Group, Inc., et. al., U.S. District Court, District of New Jersey, 1989-  .

President, American Law and Economics Association, 1991-92.

Council of Academic Advisers, American Enterprise Institute, 1994-  .

## APPENDIX II

George L. Priest
350 Livingston Street
New Haven, Connecticut 06511
(203) 562-8467
FAX (203) 562-7692

May 6, 2005

A. Cases in which I have provided Expert Testimony by Trial or Deposition over the past four years:

McCandless Fuels, Inc. v. Progressive Fuels, Inc., et al., Middlesex County, NJ, No. MID-L-7593-99 (deposition);

Western MacArthur Company, et al. v. United States Fidelity & Guaranty Co., Alameda County, CA, Case No. 828101-2 (deposition and trial);

Ting, et al. v. AT&T, N.D. CA, Case No.: C-01-2969-BZ (trial);

Beddingfield, et al. v. Mercer Trucking, Inc., et al. Tenth Jud. Cir. AL, CV-00-0391 ER (trial);

In re Chandler, et al. v. Chevron U.S.A., et al., Hale County, AL, Case No. CV-98-122 (deposition);

Cruz, et al. v. The Prudential Insurance Company of America, S.D. FL, Case No. 97-2021-Cv-KMM (deposition);

Kulpa, et al. v. Nationwide Mutual Fire Insurance Company, et al., Marshall County, WV, Civil Action No. 01-C-44 M (deposition);

Trammell v. Zurich American Life Insurance Company, M.D. AL, Civil Action No.: 02-T-422-N (deposition);

Henthorn v. McMillen, et al., Wetzel County, WV, Civil Action No. 96-C-43K (deposition);

International Paper Company, et al., vs. Agricultural Excess and Surplus Insurance Company, et al., County of San Francisco, CA, No. 974350 (deposition and trial);

Macomber v. Travelers Property & Cas. Corp., J.D. New Britain, CT, Complex Litigation Docket (deposition and trial);

Haddock, et al. v. Nationwide Financial Services, Inc., et al., D. CT, Civil Action No: 3:01CV1552 (CFD) (deposition);

In Re: The Babcock & Wilcox Company, et al., U. S. Bankruptcy Ct., E.D. Louisiana, 00-10993-95 (deposition and trial);

Lone Star Steakhouse & Saloon v. Liberty Mutual, D. Kan., Case No. 02-1185-WEB (deposition);

Broadway Theatre Corp. v. Buena Vista Pictures Dist., et al., D. Conn., Civil Action No: 300-CV-00706 (SRU) (deposition);

In re: Pittsburgh Corning Corporation, U. S. Bankruptcy Court, W.D. Pennsylvania, Case No. 00-22876 JKF (deposition);

In re:  Remeron Antitrust Litigation, D. N.J., Master Docket No. 03-CV-0085 (FSH) (deposition);

In re Johns-Manville Corporation, et al., U.S. Bankruptcy Court, S.D. N.Y., Case No. 82 B 11656 (BRL) (trial);

Garamendi vs. Altus Finance S.A., et al., C.D. Cal., Case No.:  99-02829 AHM (CWx) (deposition);

Willis, et al. v. American Honda Finance Corporation, M.D. Tenn., No. 3-02-0490 (deposition);

Gallatin Fuels, Inc. vs. Westchester Fire Insurance Co., W.D. Penn., No. 02-2116 (deposition);

In re:  Federal Mogul Global, Inc., T&N Limited, et al., U.S. Bankruptcy Court, D. Delaware, Case No.: 01-10578 (RTL) (deposition);

Congoleum Corporation vs. ACE American Insurance Company, et al., Sup. Ct., Middlesex County, N.J., Docket No.:   MID-L-8908-01 (deposition);

Owens Corning v. Birmingham Fire Ins. Co., et al., Ct. of Common Pleas, Lucas County, Ohio, Case No.: CI0200104929 (deposition);

Claybrooks, et al. v. PRIMUS Automotive Financial Services, et al., M.D. Tenn., No. 3-02-0382 (trial);

Clinton v. Union Carbide Corporation, et al., San Francisco County, CA, Case No. 433284 (deposition);

In re Congoleum Corporation, et al., U.S. Bankruptcy Court, D. N.J., Case No. 03-51524-KCF (deposition).


B.  My current rate of compensation is $700.00 per hour plus out-of-pocket expenses.